82 F.3d 422
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Lloyd Verl GREENHALGH; Deann Greenhalgh, husband and wife,
Plaintiffs-Appellees,
v.
UNITED STATES of America, Through the DEPARTMENT OF the AIR
FORCE, Defendant-Appellant.
 No. 94-36246.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 4, 1996.
Decided April 11, 1996.
 
 Before: FLETCHER, JOHN T. NOONAN, Jr., and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The United States appeals an award of $905,036 under the Federal Tort Claims Act ("FTCA") to Lloyd Verl Greenhalgh and DeAnn Greenhalgh for damages relating to injuries Lloyd sustained when the scaffolding on which he was working collapsed. The district court found that the collapse was caused by a sonic boom generated by an Air Force SR-71 jet and that the jet was flying at supersonic speed below 30,000 feet at the time of the boom, in violation of Air Force Regulation 55-34. We conclude that these findings were not clearly erroneous and, accordingly, we AFFIRM the decision of the district court, agreeing with the court that "the discretionary function" exception in the FTCA does not operate to bar this suit.
 
 STANDARD OF REVIEW
 
 3
 A district court's factual findings are reviewed for clear error and will not be disturbed if the district court's account of the evidence is a plausible view of the evidence. American Home Assurance Co. v. American President Lines, Ltd., 44 F.3d 774, 777 (9th Cir.1994) citing to Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). This court reviews de novo the district court determination of FTCA subject matter jurisdiction, Faber v. United States, 56 F.3d 1122, 1124 (9th Cir.1995), and the United States bears the ultimate burden of proving the applicability of the discretionary function exception under the FTCA. Id.
 
 FACTS
 
 4
 On September 14, 1987 at about 11:00 a.m. Lloyd Greenhalgh was standing with his son Kirt on a wooden scaffold attached to the house they were constructing in Teton City, Idaho for the Gibson family. Both men heard a "terrific" sonic boom and the scaffolding collapsed "instantly" throwing Lloyd to the ground. Kirt, who was able to grab onto supports to keep from falling, looked up and saw a jet and vapor trail. Mrs. Greenhalgh heard the boom in the adjacent community of St. Anthony where she was working as a school bus driver; she thought her van gas tank had exploded. All three Greenhalghs and several other witnesses testified that the sonic boom was by far the worst they had ever experienced. The boom was recorded on seismic instruments in the area. In the accident Lloyd sustained permanently disabling spinal and leg injuries. Lloyd lost his construction business and Mrs. Greenhalgh is now the sole wage earner for the family.
 
 
 5
 On September 14, 1987, the SR-71 was on a training run on the authorized flight path "Becky," one of the pre-approved flight paths the Air Force maintains for supersonic jets. These routes are loaded into the plane's computer before takeoff and the pilot and air reconnaissance officer ("ARO") are to follow the "black line" that shows on the computer screen the route to be flown. The pilot and ARO control altitude and speed manually. The "Becky" route passes within the vicinity of Teton City and turns south shortly thereafter. Almost all of the route is to be flown at supersonic speeds. The flight is to be subsonic only for the initial climb, air refueling, descent, and landing. Refueling takes place in midair at an altitude of around 25,000 feet.
 
 
 6
 Section 3.e. (3) of U.S. Air Force Regulation 55-34, dated 27 February 1984, provides with respect to supersonic operations:
 
 
 7
 (b) Planned supersonic flight over land areas must be conducted above flight level 300 [30,000 feet], unless waived by HQ USAF/LEEV.
 
 
 8
 (c) Avoid populated areas and HQ USAF specified critical areas (listed in FLIP AP/1B).
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 (e) If mission-essential operational requirements dictate noncompliance with the above supersonic flight criteria, a waiver request must be submitted ...
 
 
 12
 The district court concluded that both the altitude and populated area requirements of the Regulation were mandatory and that their violation by the flight rendered the discretionary function exception to the Federal Tort Claims Act inapplicable. We agree, but in our decision discuss only the altitude requirement.
 
 DISCUSSION
 
 13
 Discretionary acts of the government are not actionable under FTCA, 28 U.S.C. § 2680(a), which lists exceptions to the FTCA waiver of governmental immunity. The "discretionary function" excepts from suit:
 
 
 14
 (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 15
 Where the exception applies, no federal subject matter jurisdiction exists. In re The Glacier Bay, 71 F.3d 1447, 1450 (9th Cir.1995). If the action is required by a mandatory and specific provision in a federal statute or regulation, the action is not discretionary. Berkowitz v. United States, 486 U.S. 531, 536 (1988); Kennewick Irrigation District v. United States, 880 F.2d 1018, 1026-1027 (9th Cir.1989). Both parties acknowledge that if the plane was flying at supersonic speeds below 30,000 feet when the boom occurred the exception does not apply.
 
 
 16
 In reviewing the findings of the district court, this court must be "especially reluctant to set aside a finding based on the trial judge's evaluation of conflicting lay or expert oral testimony." Beech Aircraft Corp. v. United States, 51 F.3d 834, 838 (9th Cir.1995). We also give this deference to inferences drawn by the district court. Id. Because the government does not dispute the district court's finding that a sonic boom occurred and caused the scaffold's collapse, we turn to the evidence presented at trial, as excerpted on appeal to this court, as to the altitude of the plane at the time of the boom.
 
 
 17
 The Greenhalghs offered as evidence to show that the SR-71 was below 30,000 feet at the time of the boom the facts (a) that immediately following the boom two witnesses saw the plane and at least one saw its vapor trail, and (b) that no other "Becky" training flight produced complaints or a similar seismic recording. The Greenhalghs also relied on Forsnes' testimony.
 
 
 18
 As to the plane sightings the government simply offered testimony that vapor trails can be visible above 30,000 but that above 40,000 feet the probability decreases; and that commercial jets, which are bigger than SR-71s, can be seen at 35,000-41,000 feet.
 
 
 19
 The government's own witness, Pilot Lt. Col. Duane Noll, was aware of no other damage complaints being filed on any of the more than 200 supersonic SR-71 flights he had flown. He also testified that not all aspects of the "Becky" flight plan were automatic in that the pilots controlled the altitude of the plane for much of the flight.
 
 
 20
 Forsnes' testimony and expert opinion presented his calculations as to the direction and speed of the aircraft at the time of the boom. He reasoned by inference from his calculations and other evidence as to how the wood fractured that the sonic boom and fracture of the scaffold could not have been caused by an airplane flying a straight and level flight path at or above 30,000 feet.
 
 
 21
 The government expert Plotkin concluded that at the time of the boom the aircraft was supersonic at 43,000 feet, flying eastward, climbing gently and executing a 32 degree bank turn to the right, passing approximately 6 nautical miles to the north of Teton City. Plotkin testified that he recreated the flight path by plotting the flight parameters and other information derived from the on-board Mission Recording System ("MRS") computer maintained by the government. A person may have transferred the actual MRS-generated data into the Air Force Sonic Boom Repository where it was retained in a new form and the original MRS data was routinely destroyed after it was no longer needed, according to the government.
 
 
 22
 Plotkin testified that the MRS figures as transposed into the Repository contained anomalies. The district court was concerned that the original data was no longer available and that the anomalies had tainted Plotkin's entire result. These concerns were not relieved to the district court's satisfaction by Plotkin's explanations of the data and the anomalies.
 
 
 23
 Government witnesses testified that any deviations from the approved SR-71 flight plan, including supersonic flight below 30,000 feet, would result in immediate notification and discipline of the pilots. Pilots Lt. Col. Duane Noll and Lt. Col. Thomas Veltri testified and provided statements that nothing unusual occurred on this flight and that they received no such notifications. Their log book entries show nothing unusual about the flight. The government offered no evidence that any waiver was obtained for the flight.
 
 
 24
 To summarize, the government presented evidence which contained anomalies not explained to the satisfaction of the district court and which was based on computer data which no longer existed in its original form. Government witnesses also testified that any flight below 30,000 would have resulted in discipline of the pilots and that no such discipline occurred. The Greenhalghs offered eyewitness sighting of the jet and its vapor trail at low altitudes immediately following the sonic boom, and evidence that no other "Becky" flights generated similar complaints. The parties' experts disagreed as to whether the flight was below 30,000 feet at the time of the sonic boom.
 
 
 25
 We have reviewed the evidence presented to the court as generously excerpted by both parties on appeal and the court's detailed consideration of the theories posited by both sides as to the altitude of the plane at the time of the boom. The district court inferred from the evidence presented at trial that the SR-71 was flying at supersonic speed below 30,000 feet when the sonic boom caused the scaffold to collapse. We cannot say that there was clear error in this finding. Because supersonic flight below 30,000 feet is a violation of Regulation 55-34, we need not address the district court conclusion that the government violated the requirement in Regulation 55-34 that supersonic flights are to avoid populated areas.
 
 
 26
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3